168 U.S. 349 (1897)
ST. ANTHONY FALLS WATER POWER COMPANY
v.
ST. PAUL WATER COMMISSIONERS.
MINNEAPOLIS MILL COMPANY
v.
SAME.
Nos. 28, 24.
Supreme Court of United States.
Argued October 13, 14, 1897.
Decided November 29, 1897.
*357 Mr. Rome G. Brown for plaintiffs in error. Mr. Charles S. Albert was on his brief.
Mr. James E. Markham and Mr. Herman W. Phillips for defendants in error.
Mr. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.
It is claimed upon the part of the plaintiffs in error that by the decision of the court below they have been deprived of their property without due process of law. They urge that they have certain rights as riparian owners of land near St. Anthony Falls, bordering upon the Mississippi River, to the use of all the water as it would naturally flow past their land, and that this right is property; that its existence and extent are to be determined by the general law applicable to riparian owners in like situation, which right is not determined conclusively by a state court, and that being property it cannot be taken away or impaired either by other private owners or by the State, except that if the latter should require the use of any portion of the water for any public purpose it may only be taken or diverted upon due compensation being made. These rights, it is claimed, are protected by the Federal Constitution, and that as such claim was duly presented before the state tribunal, the question is now open for review by this court.
*358 If wrong in their above claim the plaintiffs in error then urge that if it be assumed that the State originally had the power to make a diversion of some portion of the water in the Mississippi River for the purpose of supplying the city of St. Paul with water, yet that through the action of the territorial legislature in 1856, in granting these plaintiffs in error their charters, with the powers and rights therein named, the Territory gave and released to plaintiffs in error the right to use all of the water naturally flowing in the river past their lands for the purpose of power free from the right of any subsequent territorial or state legislature to divert the waters in the manner complained of herein without making compensation.
These charters are claimed by the plaintiffs in error to be contracts, the obligations of which no subsequent legislature could impair, and it is argued that the act of 1881 and the subsequent acts amendatory thereof, granting to the defendant in error a right to use water for the purposes therein named, do impair the obligations of these contracts, and therefore are absolutely void.
They also urge that, even if their riparian rights are to be governed by the general rules of law laid down by the highest court of Minnesota, it will be found that the former decisions of that court upon that subject have fixed in plaintiffs the property rights which they here claim, and that this court should not be bound by the last decision of the state court upon the question, as evidenced by the judgment under review, because it is wholly inconsistent and at war with all the prior decisions of the state court, and ought not to be followed.
These contentions on the part of the plaintiffs in error are now to be examined.
(1) In regard to the first proposition, we are of opinion that the property rights of the plaintiffs in error, as riparian owners, are to be measured by the rules and decisions of the state courts of Minnesota. This principle, we think, has been announced and adhered to by this court from its very early days, and no distinction has been made between the rights of the original States and those which were subsequently admitted *359 to the Union under the provisions of the Federal Constitution. The provisions of the act of Congress, already cited, (act of February 26, 1857, c. 60, § 2, 11 Stat. 166,) making the Mississippi River a common highway for the inhabitants of the State and all other citizens of the United States, do not impair the title and jurisdiction of the State over the navigable waters within her boundaries more than rights of that nature are limited with regard to the original States. This has been uniformly held, and is so stated in many of the cases hereinafter cited where similar language has been used in the acts admitting States into the Union.
Preliminarily, it may be said that the Mississippi River at the point in question is a navigable stream. In order to be navigable, it is not necessary that it should be deep enough to admit the passage of boats at all portions of the stream. One witness for the plaintiffs in error said that in its natural state the river at this point was not navigable at ordinary stages of the water for half a mile below St. Anthony Falls, and in its natural state it was not navigable immediately above the falls, but that it was navigable in its natural state above Nicollet Island. He also stated that when he said the Mississippi River was not navigable at these falls, he meant that it was not navigable for boats; that boats could not go up and down in its natural condition; that it was always used for logs with chutes that are artificially prepared. It was navigable below the rapids and navigable above the rapids, and that the dam made it so. It was navigable above the rapids for the purpose of running shallow boats and for floating logs. What is said hereafter in regard to the river is based upon the really unquestionable fact that it is a navigable river at all points referred to in these records.
In Martin v. Waddell, 16 Pet. 367, it was held that, when the American Revolution was concluded, the people of each State became themselves sovereign, and in that character held the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the General Government. The action was ejectment for 100 acres of land *360 covered with water in Raritan Bay in the township of Perth Amboy, in the State of New Jersey. The claim of the plaintiff was founded upon the charters of Charles II to his brother, the Duke of York, in 1664 and 1674, for the purpose of enabling him to plant a colony on the continent of America, the land in controversy being within the boundaries of the charters and in the territory which now forms the State of New Jersey. Those letters patent, as construed by this court, conveyed to the Duke of York all the prerogatives and powers of government residing at the time of their execution in the King of Great Britain, and passed from the jurisdiction of Great Britain to the people of each State after the Revolution. Although the question in that case arose in regard to lands covered with water in Raritan Bay, yet the principles upon which the case was decided have been stated to apply to the rights of the States in regard to all navigable waters within their jurisdiction.
In Pollard v. Hagan, 3 How. 212, the question arose in regard to the rights of the State of Alabama in the shores of navigable waters and the soils under them within her limits. The sixth section of the act of Congress, passed on the 2d of March, 1819, 3 Stat. 492, c. 47, for the admission of the State of Alabama into the Union, provided: "That all navigable waters within the said State shall forever remain public highways, free to the citizens of said State and of the United States, without any tax, duty, impost or toll therefor, imposed by said State." It was held that the Government of the United States did not by reason of that enactment possess any more power over the navigable waters of Alabama than it possessed over the navigable waters of other States under the provisions of the Constitution, and that Alabama had as much power over those navigable waters as the original States possessed over the navigable waters within their respective limits. It was also held that the shores of navigable waters and the soils under them were not granted by the Constitution of the United States, but were reserved to the States respectively, and the new States had the same rights, sovereignty and jurisdiction over the subject as the original States.
*361 In Goodtitle v. Kibbe, 9 How. 471, the decision of this court in Pollard v. Hagan, supra, was referred to and affirmed, and it was said that, by the admission of the State of Alabama into the Union, that State became invested with the sovereignty and dominion over the shores of the navigable rivers between high and low water mark, and that after such admission Congress could make no grant of land thus situated.
In Barney v. Keokuk, 94 U.S. 324, it was recognized as the law that the title and rights of riparian proprietors upon the banks of the Mississippi were to be settled by the States within which the lands were included. Mr. Justice Bradley, in stating the opinion of the court in that case, said (at page 338): "And since this court in the case of The Genesee Chief, 12 How. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated. In Iowa, as before stated, the more correct rule seems to have been adopted after a most elaborate investigation of the subject."
It was also said by the same learned justice in speaking of the English idea of navigable waters being necessarily tide waters: "It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide water at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several States themselves *362 to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject the correct principles were laid down in Martin v. Waddell, 16 Pet. 367; Pollard's Lessee v. Hagan, 3 How. 212, and Goodtitle v. Kibbe, 9 How. 471. These cases related to tide water, it is true; but they enunciate principles which are equally applicable to all navigable waters."
In St. Louis v. Myers, 113 U.S. 566, this court held that the act of March 6, 1820, 3 Stat. 545, admitting the State of Missouri into the Union, left the rights of riparian owners on the Mississippi River to be settled according to the principles of state law. Mr. Chief Justice Waite, in delivering the opinion of the court, said: "The act of Congress providing for the admission of Missouri into the Union, act of March 6, 1820, c. 22, 3 Stat. 545, and which declares that the Mississippi River shall be `a common highway and forever free,' has been referred to in the argument here, but the rights of riparian owners are nowhere mentioned in that act. They are left to be settled according to the principles of state law."
In Packer v. Bird, 137 U.S. 661, it was held, that as the highest court of California had decided that the Sacramento River being navigable in fact, a title upon it extends no farther than to the edge of the stream, this court would accept that decision as expressing the law of the State. That case asserted the right of each State to determine the extent of the title and of the rights of the riparian owners in waters within the territory of the State. It was also stated that the Federal courts must construe grants of the General Government without reference to the rules of construction adopted by the States for grants by them, but that whatever incidents or rights attach to the ownership of property conveyed by the United States bordering on navigable streams, would be determined by the States in which it is situated, subject to the limitation that their rules do not impair the efficacy of the grant, or the use and enjoyment of the property by the grantee. It was further said that: "As an incident of such ownership the right of the riparian owner, where the waters are above the influence of *363 the tide, will be limited according to the law of the State, either to low or high water mark, or will extend to the middle of the stream."
It does not impair the efficacy of the grant or the use and enjoyment of the property by the grantee to hold that riparian rights are to be decided by the state courts, inasmuch as the grant, if by the Federal Government, has been held in the cases already cited, not to include title over navigable waters within or bounded by the States.
In Hardin v. Jordan, 140 U.S. 371, it was held that grants by the United States of its public lands bounded on streams and other waters, made without reservation or restriction, are to be construed, as to their effect, according to the law of the State in which the lands lie, and that it depends upon the law of each State to what extent the prerogative of the State to lands under water shall extend. In the opinion, after stating that the title to the shore and lands under water is in the State and is regarded as incidental to its sovereignty, it is said: "Such title being in the State, the lands are subject to state regulation and control, under the condition, however, of not interfering with the regulations which may be made by Congress with regard to public navigation and commerce... . Sometimes large areas (of land) so reclaimed are occupied by cities and are put to other public or private uses, state control and ownership therein being supreme, subject only to the paramount authority of Congress in making regulations of commerce and subjecting the lands to the necessities and uses of commerce" (citing cases). Continuing, the court said: "This right of the States to regulate and control the shores of tide waters and the land under them is the same as that which is exercised by the crown in England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas; and also, in some of the States, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and, in Pennsylvania, to all the permanent rivers of the State; but it depends upon the law of each State to what waters and to what extent this prerogative of the State over the lands under water shall be exercised."
*364 Mr. Justice Brewer, in his dissenting opinion (p. 402) in the above cited case, which was concurred in by Mr. Justice Gray and Mr. Justice Brown, agreed: "That the question how far the title of a riparian owner extends is one of local law. For a determination of that question the statutes of the State and the decisions of its highest court furnish the best and the final authority." And the dissent was based upon the theory that although the right of the State to determine this matter was not questioned in the prevailing opinion, there was, nevertheless, error committed by the majority of the court in refusing to follow a decision of the state court on the very question then under review, and in following instead thereof previous decisions of the state court inconsistent therewith.
In St. Louis v. Rutz, 138 U.S. 226, 242, cited in the dissenting opinion above referred to, it was said by Mr. Justice Blatchford, in delivering the opinion of the court: "The question as to whether the fee of the plaintiff, as a riparian proprietor on the Mississippi River, extends to the middle thread of the stream, or only to the water's edge, is a question in regard to a rule of property which is governed by the local law of Illinois."
In Kaukauna Water Power Company v. Green Bay & Mississippi Canal Co., 142 U.S. 254, Mr. Justice Brown, in delivering the opinion of the court, said at page 271: "It is the settled law of Wisconsin, announced in repeated decisions of its Supreme Court, that the ownership of riparian proprietors extends to the centre or thread of the stream, subject, if such stream be navigable, to the right of the public to its use as a public highway for the passage of vessels (citing cases). In City of Janesville v. Carpenter, 77 Wisconsin, 288, 300, it is said of the riparian owner: `He may construct docks, landing places, piers and wharves out to the navigable waters, if the river is navigable in fact, but if it is not so navigable he may construct anything he pleases to the thread of the stream, unless he injures some other riparian proprietor, or those having the superior right to use the waters for hydraulic purposes... . Subject to these restrictions, he has the right to use his land under water the same as above water. It is his private *365 property under the protection of the Constitution, and it cannot be taken, or its value lessened or impaired even for public use, "without compensation," or "without due process of law," and it cannot be taken at all for any one's private use.' With respect to such rights, we have held that the law of the State, as declared by its Supreme Court, is controlling as a rule of property."
In Shively v. Bowlby, 152 U.S. 1, it was again said that the new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters and in the lands under them within their respective jurisdictions. It was also remarked that, upon the question, how far the title of the owner of the land extends bounding upon a river actually navigable, but above the ebb and flow of the tide, there is a diversity in the laws of the different States; and that the title and rights of riparian or littoral proprietors in the soil below high-water mark are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution.
The suit was in the nature of a bill in equity brought to quiet title to lands below high-water mark in the city of Astoria, the question involving the rights in navigable waters as between the State and others. The opinion at page 57 states as follows: "By the law of the State of Oregon, therefore, as enacted by its legislature and declared by its highest court, the title in the lands in controversy is in the defendants in error; and, upon the principles recognized and affirmed by a uniform series of recent decisions of this court above referred to, the law of Oregon governs the case." The opinion refers to all the cases which we have above cited and many others, upon the various questions which are discussed in the case, and recognizes the rule that it belongs to the States to decide as to the character and extent of the riparian rights of owners upon navigable waters within such States.
It is true that in these various cases the exact point in controversy in this case in regard to the rights of the State as against riparian owners has not arisen. The dispute has generally been as to the extent and character of the title as between *366 the United States or the State and the riparian owner to lands under water, and as to the right of the riparian owner to build out from the shore piers or wharves so as to reach the navigable portion of the stream; but the principles laid down in all of these cases necessarily include the right of the state courts to decide, as a matter of local law, the point now under discussion, subject to the acknowledged jurisdiction of the United States under the Constitution in regard to commerce and the navigation of the waters of rivers. The jurisdiction of the State over this question of riparian ownership has been always, and from the foundation of the government, recognized and admitted by this court. The extent of the plaintiff's riparian right of property was therefore the subject of adjudication by the state court, and the rule has been definitely stated by that court in its judgment, which is now under review.
(2) It is claimed, however, by the plaintiffs in error that this judgment is the only case in the State where the ruling made therein has been adopted, and that this particular judgment is at war with and opposed to every other ruling upon the subject heretofore made by the Supreme Court of that State; and they contend that upon the authority of Hardin v. Jordan, supra, this court should disregard the judgment of the state court in this case and follow the previous decisions of that court on this subject. As to the case of Hardin v. Jordan, it may be said that it went as far as this court ought to go in refusing to follow the latest decision of the highest court of a State in regard to a matter upon which the judgment of that court is regarded as conclusive. It will be observed, however, that the decision in Hardin v. Jordan, in refusing to follow the ruling of the Supreme Court of Illinois, in Trustees of Schools v. Schroll, 120 Illinois, 509, was placed upon the asserted fact that such ruling of the Supreme Court of Illinois was not necessary to the decision of the case, and that, being opposed to the entire course of the previous decisions of that State, it should be disregarded. It is not so here. The ruling of the state court was necessary to the decision of this case and stands as the latest, if not the only, exposition *367 of the views of that court upon the question involved. We ought, therefore, to follow that case.
However, with regard to the decisions of the state court upon this subject, cited by counsel for the plaintiffs in error, we think there is not one of them which is inconsistent with the decision of that court in the cases now under review. The question did not arise in any of them upon the right of the State as against plaintiffs in error, or any one in like situation, to divert a portion of the flow of the water in the Mississippi River to any public purpose so long as it did not interfere with the navigation of the river.
The cases of Schurmeier v. St. Paul & Pacific Railway, 10 Minnesota, 82; Brisbine v. St. Paul & Sioux City Railroad, 23 Minnesota, 114; Morrill v. St. Anthony Falls Water Power Co., 26 Minnesota, 223; Minnesota v. Minneapolis Mill Co., 26 Minnesota, 229; Union Depot &c. v. Brunswick, 31 Minnesota, 297; Hanford v. St. Paul & Duluth Railroad, 43 Minnesota, 104; and St. Anthony Falls Water Power Co. v. Minneapolis, 41 Minnesota, 270, are cited to sustain the contention of the plaintiffs in error.
An examination of these cases shows that the question did not arise and was not decided in any of them. Some of the cases relate to the question as to what was the proper boundary, high or low water mark, of lands mentioned therein, and in others the question arose as to the riparian right of owners of lands adjoining the Mississippi River to build piers or docks out to the navigable portion of the stream, or to fill up and build upon a portion of the river out to its navigable part; or it was a question of the right of a riparian proprietor to compensation from a railway company seeking to condemn for the purposes of its railway a certain portion of land owned by him between the centre of a street and the centre of the channel of the river. In none of the cases was there involved the right of the State to divert for public purposes a portion of the flow of a river, while not in the slightest degree or in any way affecting the navigability of the stream.
In Union Depot &c. v. Brunswick and in Brisbine v. St. Paul &c. Company, supra, substantially the same questions *368 arose, and in the latter case, in speaking of some of the riparian rights of an owner upon the banks of a navigable stream, the court said:
"What these rights are, especially in regard to land acquired originally from the United States, and bordering, as this does, upon the Mississippi River, we regard as fully and correctly settled by the Federal Supreme Court. Dutton v. Strong, 1 Black, 23; Railroad Company v. Schurmeier, 7 Wall. 272; Yates v. Milwaukee, 10 Wall. 497. According to the doctrine of these decisions the plaintiff possessed the right to enjoy free communication between his abutting premises and the navigable channel of the river, to build and maintain, for his own and the public use, suitable landing places, wharves and piers, on and in front of his land, and to extend the same therefrom into the river to the point of navigability, even though beyond low-water mark, and to this extent exclusively to occupy, for such and like purposes, the bed of the stream, subordinate and subject only to the navigable rights of the public and such needful rules and regulations for their protection as may be prescribed by competent legislative authority. The rights which thus belong to him as riparian owner of the abutting premises were valuable property rights, of which he could not be divested without consent, except by due process of law, and, if for public purposes, upon just compensation. Yates v. Milwaukee, 10 Wall. 497."
In Union Depot Street Railway v. Brunswick and others, 31 Minnesota, 297, it was held to be the settled law of Minnesota that a riparian owner upon a navigable stream has the fee to low-water mark; and that in addition he owns as an incident to his ownership certain riparian rights, among which are the right to enjoy free communication between his abutting premises and the navigable channel of the stream, to build and maintain suitable piers, landings or wharves on and in front of his land, and to extend the same therefrom into the stream to the point of navigability even beyond low-water mark, and to this extent exclusively to occupy for such and like purposes the bed of the stream, subordinate only to the paramount public right of navigation. These riparian rights *369 the court held to be property, and that they were not to be taken by the State without paying just compensation therefor. The rights which were held subordinate only to the paramount public right of navigation were those mentioned by the court, and not a word was said as to the right of flowage, which was not involved and was not alluded to.
In Morrill v. St. Anthony Falls Water Power Company, supra, the Supreme Court of Minnesota held that the riparian owner of lands upon a navigable stream may use the water flowing past his land for any purpose, so long as he does not impede navigation, in the absence of any counterclaim by the State or the United States. It will be seen that this case does not refer to the right to receive the full amount of the natural flowage from above, but only to the right to use that which does flow, in the absence of any counterclaim by the State or the United States.
The same general statement of the rights of riparian owners is made in Hanford v. St. Paul & Duluth Railroad, supra. That case treats of the rights of a riparian owner in the bed of the stream above low-water mark as subject to the right of the public to use the same for the purposes of navigation, and adds that "restricted only by that paramount public right, the riparian owner enjoys valuable proprietary privileges, among which we shall consider particularly the right to the use of the land itself for private purposes... . Subject only to the limitation that he shall not interfere with the public right of navigation, he has the unquestionable and exclusive right to construct and maintain suitable landings, piers and wharves into the water and up to the point of navigability for his own private use and benefit (citing cases)... . And it is obviously immaterial, if the public interests be not prejudiced, whether the submerged land be covered with wharves of timber or stone, or be reclaimed from the water by filling in with earth so that it becomes dry land. The land may be so reclaimed." It is also said in the course of the opinion: "The limit to the private right is imposed by the public right, and the private right exists up to the point beyond which it would be inconsistent with the public right."
*370 All this was said in regard to the case then under discussion, which related to the right of a riparian proprietor to reclaim the submerged land to the point of navigability, and to alienate the same so that the alienee might have the rights of the riparian owner, although having no interest in the original riparian estate. The question here involved was neither decided nor considered.
In Schurmeier v. St. Paul & Pacific Railroad Company, 10 Minnesota, 82, which was affirmed in 7 Wall. 272, it was held that the grantee from the United States had his line bounded by the river, at least to low-water mark, and when after the grant was made to him he platted it into blocks as part of the town of St. Paul that he still retained in the land over which the streets and landing were laid the fee, subject only to the use of the public for the purposes designated, and that the railroad company, having no legal authority to use the streets or landing for railroad tracks, and such use being a special injury to the plaintiff, he was entitled to an injunction. In that case Mr. Chief Justice Wilson, in the state court, was of the opinion that the riparian proprietor went to the middle of the river; that that was the rule at common law, and, in his opinion, there was no reason to doubt that the common law prevailed in Minnesota as to that question; but while so holding, as his individual opinion, he said that other authorities regarded the boundary line of the riparian proprietor to be low-water mark, and even on that assumption the place in dispute was within the title of the riparian proprietor.
The state court subsequently decided that the title of a riparian owner on a navigable stream went only to low-water mark.
St. Anthony Falls Water Power Company v. City of Minneapolis, supra, does not decide the point contended for by the plaintiffs in error. It was a contest between private parties as to the effect of a certain deed in reserving rights to the grantor and as to the extent of the right of flowage contained in the deed. The question here under discussion was not even remotely affected.
*371 We have looked in vain among all the cases in the state court, cited by counsel for the plaintiffs in error, for any decision upon this question. Whatever may be the rights of the plaintiffs in error under their charters or as the riparian owners of land to build and maintain their dams to the centre of the stream, there is no decision cited which holds that they are entitled to the use of all the water which would naturally flow past their lands and over their dams so constructed, nor has the state court decided that the only right of the State, to which this alleged right of the plaintiffs in error is subject or subordinate in any way, is limited to the right of the State to control or use the bed of the stream and the waters therein for purposes of navigation only. That limitation has never been placed upon the State with reference to the point here in question. The state Supreme Court in deciding this particular case was not therefore announcing a rule which was at all inconsistent with or opposed to any of its former decisions; and as the extent of the riparian rights in this case was a subject committed to the jurisdiction of the State of Minnesota, we are bound, so far as this question is concerned, to follow the decision of the highest court of that State as announced in this case.
(3) If wrong in their above contentions, the plaintiffs in error then assert that their charters granted in 1856, and set forth so far as material in the foregoing statement of facts, gave and guaranteed to them the right to use and develop the water power of St. Anthony Falls, and authorized them to build such structures in and upon the river as were necessary to develop that power, and that when these provisions of their charters were accepted and acted upon, they became contract obligations between the State of Minnesota and the plaintiffs, and that the statute above mentioned, authorizing the defendant to divert some portion of the natural flow of the water without compensation to the plaintiffs, was a violation of the Federal Constitution, as impairing the obligation of the contracts contained in the charters referred to.
We think this contention cannot be maintained. We are of opinion that the true construction of these territorial *372 charters does not give such contract rights as are claimed by the plaintiffs in error. They were grants of power to the respective companies, under which they were licensed to build their dams out into the river for the purpose of utilizing the power, and of using the water that flowed down the river. These grants were in legal effect subject at all times to the paramount right of the State as trustee for the public to divert a portion of the waters for public uses, and they were also subject to the rights in regard to navigation and commerce existing in the General Government under the Constitution of the United States. See also upon this subject, Watuppa &c. Co. v. Fall River, 147 Mass. 548; City of Auburn v. Union Waterpower Co., 38 Atlantic Rep. 561, Supreme Court of Maine, Oct. ____, 1897. There was no contract by virtue of these charters that the companies should always and for all time be entitled to all the natural flow of the water in the river without regard to the right of the State as above mentioned. The claim made by the companies seems to us most extravagant. The State or any particular subdivision thereof acting under its authority would, if these claims were valid, be forever thereafter prevented from using any portion of the waters of the river for any public purpose unless compensation for such use were first made these plaintiffs. This construction of the meaning of the charters assumes the power of a territorial or state legislature to bind future legislatures in dealing with these public rights, and it prevents the latter from providing for the use of any portion of the waters for public purposes of the most important character without first making compensation to the plaintiffs for that use. If we should assume the validity of an act of the legislature of such a character, (which, under the decision of this court in Illinois Central Railroad v. Illinois, 146 U.S. 387, is at least doubtful,) it is clear that we ought not to adopt a construction leading to that result unless the legislative act be plain and beyond all doubt. We are of opinion that these particular charters of the plaintiffs are not to be thus construed. The sections of the acts which are material upon this point simply authorize the companies to maintain their dams and sluices, *373 and permit them to construct and maintain other dams, etc., for the purpose of manufacturing, or for improving any water power owned or possessed by the companies, in such manner or to such extent as shall be authorized by the directors. But there is no language in the acts providing that the companies shall thereafter and always have the right to the use of all the natural flow of the water down the river. Nor is such right a necessary and legal consequence of the language used. They may have acquired by these acts the right to build dams, etc., and the right to use such water as in fact and from time to time should flow down to their dam, but there is nothing in the language of the charters showing or implying that it was the intention of the State to grant to these parties the rights now claimed by them. It is difficult to believe that a legislature would ever grant to individuals or companies rights of that nature, even if it be assumed it had the power. It was proper and in accordance with a wise public policy to grant a privilege to these companies to build dams, etc., as stated in the charters, and to permit them, by virtue of the dams and sluices, to use the water that in fact and from time to time might come down the river, but it cannot be supposed that the legislature meant by any grant of this kind to warrant that for all future time no part of the water that might otherwise naturally flow down the river should ever be used under the authority of the State for any public purpose, without compensating the plaintiffs for that diversion.
In Rundle v. Delaware & Raritan Canal Co., 14 How. 80, this court held, that by the law of Pennsylvania the Delaware River was a public navigable river, held by its joint sovereigns (the States bordering thereon) in trust for the public; that riparian owners in that State had no title to the river, or any right to divert its waters, unless by license from the States; that such license was revocable and in subjection to the superior right of the State to divert the water for public improvements, either by the State directly, or by a corporation created for that purpose; and that the proviso to the provincial acts of Pennsylvania and New Jersey of 1771 did not operate as a grant of the usufruct of the waters of the river to Adam *374 Hoops and his assigns, but only as a license or toleration of his dam. It appeared in this case that the plaintiffs in error, being plaintiffs below, were the owners of certain mills in Pennsylvania opposite the city of Trenton in New Jersey; that the mills were supplied with water from the Delaware River by means of a dam extending from the Pennsylvania shore to an island lying near and parallel to it and extending along the rapids to the head of tidewater. The plaintiffs claimed that by virtue of a proviso in the acts of the provincial legislatures of Pennsylvania and New Jersey, their predecessors had become entitled to the free and uninterrupted enjoyment of the river Delaware for the use of their mills, and that, notwithstanding, the defendants had erected a dam in the river above plaintiffs' mills and had dug a canal and diverted the water to their great injury. A demurrer was interposed, upon which the court below gave judgment for the defendants, and this court was asked to review and reverse that judgment. It was held that the proviso was nothing more than a license to keep the dam up, which could at any time be revoked.
A careful consideration of the acts in question persuades us that they are not to be construed as plaintiffs claim, and that under them the plaintiffs took no contract rights which have been impaired in any degree by the subsequent acts under which defendants claim the rights set up in their respective answers.
These views lead us to the opinion that the judgments of the Supreme Court of Minnesota in these cases are right, and they are, therefore,
Affirmed.