SCHERMERHORN v. DOZIER et al.

(Circuit Court of Appeals, Fourth Circuit. April 2, 1918.)

No. 1565.

1. NAVIGABLE WATERS ⬦1(1)—NAVIGABILITY—NONTIDAL BAY.

A nontidal bay, at the extremity of a larger bay and connected therewith by a channel, the waters of which had been immemorially, but not extensively, navigated by craft of light draft, is navigable.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Navigable.]

2. GAME ⬦2½—NAVIGABLE WATERS—RIGHTS OF RIPARIAN OWNERS—FOWLING.

Under Code Va. 1904, § 1389, and in view of section 1338, an owner of land, upon nontidal navigable waters of a bay, has no exclusive right of fowling on its waters below low-water mark, or the mark during the dry season, as such waters may be used in common.

3. GAME ⬦2½—NAVIGABLE WATERS—RIPARIAN RIGHTS—TRESPASS—FOWLING.

So long as the boat of one engaged in "mat blind shooting" for fowl does not touch the shore and is outside of the low-water mark, or the mark during dry seasons, of a nontidal navigable bay, he does not trespass on any exclusive right of the riparian owner.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Bill for injunction by F. Augustus Schermerhorn against Addie Dozier and others. Judgment for defendants, and plaintiff appeals. Affirmed.

John C. O'Conor, of New York City, and Thomas H. Willcox, of Norfolk, Va. (Baker & Eggleston and Willcox, Cooke & Willcox, all of Norfolk, Va., on the brief), for appellant.

H. H. Rumble, of Norfolk, Va. (Rumble & Campe and Jeffries & Jeffries, all of Norfolk, Va., on the brief), for appellees.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before KNAPP and WOODS, Circuit Judges, and McDOWELL, District Judge.

McDOWELL, District Judge. The appellant, who was the plaintiff below, is one of the tenants in common of a tract of land of some 2,675 acres in Princess Anne county, Va., lying on and adjoining the north and northeast shore of North Bay. North Bay is the northern extremity of a very large body of water, which commences some 10 or 12 miles south of Cape Henry and extends southward below Cape Hatteras, and which is separated from the Atlantic in the vicinity of the land in question by a rather narrow strip of land. North Bay contains approximately 1,500 acres. It is a part of a much larger sheet of water known as Back Bay. However, sundry islands, which in some sense partially separate North Bay from Back Bay, afford a reason for giving the upper body of water a separate name. According to the evidence, the waters of North Bay, at least at and near the northern end, are fresh. Whether or not North Bay is affected by the ocean tides is left in some doubt by the evidence; but we shall assume for present purposes that the effect of the tides, if any, is in North Bay too slight to justify treating the bay as tidal water. The tract of land above mentioned is used by plaintiff's associates, or lessees, as a hunting resort. On the land is a clubhouse, and the property has no considerable value, except for the purpose for which it is used. The waters of North Bay during certain seasons abound in wild duck and geese. The plaintiff claims title under sundry grants from the commonwealth. So far as we can discover from the descriptions in the title papers, in connection with the plats and charts filed in evidence, no one of these grants purports to include any part of the waters of North Bay, and the plaintiff is merely a riparian owner. There is much evidence in the record to the effect that the waters of North Bay have been immemorially used as a common for fowling. The commonwealth grants under which the plaintiff claims are all of later date than April 1, 1873, except one, which was issued in 1809. The government chart introduced in evidence shows that the bay generally is from 4 to 5 feet deep, and the channel connecting North Bay and Back Bay is nowhere less than 2½ feet in depth at mean low water. The narrow strip of land to the east and southeast of North Bay is inhabited, as is the territory to the west, northwest, and north. There is a public landing on the eastern shore of the bay, and certainly one, and according to several of the witnesses two, public landings on the north or northwestern shore.

The bill sought an injunction to prevent the numerous defendants named therein from fowling on the waters of North Bay and from using and trespassing on the shores of the plaintiff while fowling. The defendants denied having trespassed on the shores, and asserted a right of fowling on the waters of the bay. After hearing the evidence the trial court dismissed the bill. The evidence fails to show use of or trespasses upon the shores by the defendants, except in one instance by one of them; and the sole question for discussion is as to the plaintiff's alleged exclusive right of fowling on the waters of

North Bay, in so far as his land abuts upon and surrounds the northern end of that body of water.

[1] We think the first question in this case is whether or not North Bay is navigable. L. W. Brown testified that the waters of Back Bay and North Bay are used for the transportation of merchandise, and that a boat of 20 tons could start from the north end of North Bay and go down through the chain of sounds, Albemarle, Currituck, and Pamlico, and out into the ocean, and that the witness had been all the way through. This witness holds a pilot's license for all the above-mentioned waters. M. J. Eaton testified:

"That the waters of North Bay and Back Bay are used for commercial purposes for transporting merchandise all through the year; that the government station gets all their provisions and fuel through that North Bay; that there are fisheries in Back Bay, and their catch and supplies are transported to the head of North Bay; and that it is a regular commercial fishing operation, and the fish buyers come to Point of Woods, right at the head of North Bay, to buy their fish as a regular business, and the fish are transported over these waters to the head of North Bay."

On cross-examination, the witness stated that these fish are caught in Sheep's Bay, Back Bay, and North Bay, that he has seen a boat come from Back Bay to the Point of Woods (on the northwestern shore of North Bay) loaded with fish, and that he has seen this every season more than once.

J. E. White testified:

"The waters of North Bay are used for the transportation of goods and merchandise and commerce generally, and that most anything is transported over these waters; that people go to the store, and go across to and fro, and he has known timber to be rafted down and carried off, as a general thing with motorboats passing with goods of different varieties."

M. W. James testified:

"That No. 5 and also No. 4 life-saving crews and other people that he knows of used motorboats and transport their provisions from witness' father-in-law's store across North Bay, and witness has seen, about from four to six years previous, a raft with about 40,000 feet of lumber rafted at the Point of Woods and taken across the bay."

Witness stated that he had helped his brother the previous season load 5½ cords of wood, and had also a barrel of flour with provisions enough to last him two or three weeks, which they pulled across the bay in a boat. Continuing, witness stated that frequently the bay is used by the people who reside in that neighborhood for the transportation of goods and merchandise, and that witness works with the Northern clubmen in the winter at the Little Island Gunning Club, and lately a clubhouse was under construction there; the former clubhouse had been burned down, and the stuff to build a house, the lumber and material, was hauled across Back Bay.

J. T. Malbon, a former member of the Virginia House of Delegates, testified that the waters of North Bay "are used for the transportation of property and commerce." From the cross-examinations of these witnesses and other testimony, we think it is true that the navigation of North Bay has not been extensive or continuous; but the water is undoubtedly navigable by water craft of light draft, and it has im-

memorially been navigated in the not very considerable commerce of that thinly settled section. In The Daniel Ball, 10 Wall. 557, 563, 19 L. Ed. 999, it is said:

"The doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all of the navigability of waters. * * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact; and they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

In The Montello, 20 Wall. 430, 441, 22 L. Ed. 391, it is said:

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway."

In 29 Cyc. 289, it is said:

"Water is navigable in law, although not tidal, where navigable in fact, and is navigable in fact where it is of sufficient capacity to be capable of being used for useful purposes of navigation; that is, for trade and travel in the usual and ordinary modes."

See, also, 1 Farnham, Waters, 127, 130; 21 Am. & Eng. Ency. (2d Ed.) 428; State v. Water Power Co., 82 S. C. 181, 63 S. E. 884, 22 L. R. A. (N. S.) 435, 129 Am. St. Rep. 876, 17 Ann. Cas. 343; Water Power Co. v. Water Commissioners, 168 U. S. 349, 359, 18 Sup. Ct. 157, 42 L. Ed. 497.

Under these authorities we must hold that North Bay is navigable.

[2] The question, therefore, now presented, is as to the riparian rights of owners of land abutting upon navigable waters in the state of Virginia in respect to fowling on such waters. The following is from 2 Henning's Statutes at Large, p. 456, under date of April, 1679:

"Robert Liny. haveing complained to this grand assembly, that whereas he had cleared affishing place in the river against his owne land to his greate cost and charge supposing the right thereof in himselfe by virtue of his pattents, yett nevertheless severall persons have frequently obstructed him in his just priviledge of ffishing there, and in despight of him came upon his land and hale their sceanes on shore to his greate prejudice, aleadging that the water was the kings majesties, and not by him granted away in any paitent, and therefore equally free to all his majesties subjects to ffish in and hale their sceanes on shore, and praying for releife therein by a declaratory order of this grand assembly; it is ordered and declared by this grand assembly that every mans right by virtue of his pattent extends into the rivers or creekes soe farre as low water marke, and it is a priviledge granted to him in and by his pattent, and that therefore noe person ought to come and ffish there above low water marke or hale their sceanes on shoare (without leave first obtained) under the hazard of committing a trespasse, for which he is sueable in law."

We know of no reason why the principle enunciated in the foregoing legislative declaration should not apply to fowling as well as to fishing

in navigable waters. The modern form of this rule is found in section 1389, Code of Virginia 1904. Moreover, section 1338 of said Code (taken from Act April 1, 1873 [Acts 1872–73, p. 310]) reads, so far as material, as follows:

"All the beds of the bays, rivers, creeks, and the shores of the sea within the jurisdiction of this commonwealth, and not conveyed by special grant or compact according to law, shall continue and remain the property of the commonwealth of Virginia, and may be used as a common by all the people of the state for the purpose of fishing and fowling, and of taking and catching oysters and other shell fish, subject to the provisions of chapters ninety-five, ninety-six, and ninety-seven, and any future laws that may be passed by the General Assembly."

In Taylor v. Commonwealth, 102 Va. 759, 770, 47 S. E. 875, 102 Am. St. Rep. 865, it was held that this statute is declaratory of the pre-existing common law of Virginia. And we are unable to accede to the soundness of the contention that this rule applies only to tidal waters. If the water be navigable, it may beyond low water mark be used as a common for fowling and fishing. In Taylor v. Commonwealth, supra, 102 Va. page 773, 47 S. E. at page 880 [102 Am. St. Rep. 865], is the following enumeration of the rights of riparian owners whose lands abut on navigable waters:

"First. The right to be and remain a riparian proprietor and to enjoy the natural advantages thereby conferred upon the land by its adjacency to the water.

"Second. The right of access to the water, including a right of way to and from the navigable part.

"Third. The right to build a pier or wharf out to navigable water, subject to any regulations of the State.

"Fourth. The right to accretions or alluvium.

"Fifth. The right to make a reasonable use of the water as it flows past or laves the land."

See, also, Norfolk v. Cooke, 27 Grat. (Va.) 430, 433, and cases cited; McCready v. Com., 27 Grat. (Va.) 985; Grinels v. Daniel, 110 Va. 874, 877, 67 S. E. 534; Meredith v. Triple Island Club, 113 Va. 80, 84, 73 S. E. 721, 38 L. R. A. (N. S.) 286, Ann. Cas. 1913E, 531; 19 Cyc. 992.

We regard the above-quoted enumeration as complete, and hold that the plaintiff has no exclusive right of fowling on the waters of North Bay.

[3] We have not overlooked the contention that "mat blind shooting" involves necessarily a trespass on the shore. It is true that in following this method the gunner places his boat near the shore, and by placing around the boat a blind made of corn sage or reeds he creates the appearance of an extension of the shore. However, so long as his boat does not touch the shore and is outside of the low-water mark— by which we mean the line of the water during dry seasons—he is not trespassing on any exclusive right of the landowner. We are of opinion to affirm, with costs to the appellees.

Affirmed.