102  759|
105  467|
e105 509|

# Wytheville.

102    759
110    877

## TAYLOR v. COMMONWEALTH & ANOTHER.

### JUNE 16, 1904.

1. NAVIGABLE WATERS—*Underlying Land—Ownership—Riparian Owners—Joint Use by State and Riparian Owner.*—The navigable waters beyond low watermark and the soil under them, within the teritorial limits of a State, are the property of the State, to be controlled by the State, in its own discretion, for the benefit of the people of the State. Section 1338 of the Code is, in this respect, merely declaratory of existing law as commonly received and understood, and is not a mere arbitrary assumption of right by the State. The title of riparian owners extends, by statute, to ordinary low watermark, but no further. Beyond this the title is in the State, but the riparian owner has certain rights, such as the right to build wharves, and of access to the water, and a right of way over it to the channel, and the statutory right to locate a half acre of land as an oyster-planting ground, but these rights of the State and of the riparian owner must be exercised, if possible, so that the one shall not necessarily disturb or impair the enjoyment of the other. A riparian owner who is not disturbed in the enjoyment of an existing or contemplated use of a stream cannot complain of the fact that the State leases to a citizen a portion of the bed of a navigable stream for the purpose of sinking an artesian well and the use of the water therefrom. Whatever the soil underneath such navigable waters contains belongs to the State, and it alone has the right to develop these hidden sources of wealth for the common benefit of all its citizens. Nor will such riparian owner be permitted, capriciously and arbitrarily, to locate the half acre for oyster planting in such a way as to include said well, when another location would be equally beneficial to him.

Appeal from a decree of the Circuit Court of the city of Richmond in a suit in chancery wherein the appellant was the complainant, and the appellees were the defendants.

*Affirmed.*

The opinion states the case.

*McGuire & Riely* and *Robert Stiles,* for the appellant.

*Attorney-General William A. Anderson* and *Isaac Diggs,* for the appellees.

KEITH, P., delivered the opinion of the court.

Appellant filed her bill in the Circuit Court of the city of Richmond, in which she states that she is the owner in fee simple of a tract of land in Gloucester county, known as "Rosewell," containing two hundred and fifty acres, fronting on York river, being a portion of a tract which was the property of her father, now deceased, allotted to her by a decree of the Circuit Court of Gloucester county; that as riparian proprietor her rights in the soil under the waters of York river extend to the channel or navigable portion of the river, and that from the original grant from the English Crown of this land down to and including the lifetime of complainant's father, the proprietors of "Rosewell" had been in the habit of leasing the oyster lands upon their water front; that the last person who held such a lease from the proprietor of "Rosewell," while still occupying the relation of tenant to complainant, accepted from the Commonwealth a subsequent lease of the flats, or oyster planting grounds, in front of "Rosewell"; that about the year 1892, while said lessee was occupying the "Rosewell" flats, under the circumstances above set out, an artesian well was sunk between low watermark and the channel or navigable portion of York

river, and on the land of which complainant claims she is the
owner and riparian proprietor; that the water from this well
has mineral properties of great value, and that the lessee and
others united in the formation of a company for the purpose of
selling the water, which company was granted a charter by the
Circuit Court of the city of Richmond in March, 1896, under
the style of the Colonial Water Company, since which time it
has sold great quantities of water without the consent of com-
plainant; that the Colonial Water Company occupies and
claims to hold the ground on which the well is located by virtue
of the oyster lease above set forth, but that said lease conveys
to the water company no title to the ground.   The bill further
shows that at the session of 1899-1900 the General Assembly
passed "An Act to lease for a term of years ten acres of land
lying under the waters of York river, below low watermark,
in the county of Gloucester, including an artesian well thereon,
and to provide for a survey of same, and for fixing the price to
be paid therefor *per annum;* and to permit said company to
erect buildings and make improvements thereon, and to provide
for the determination of all proper questions which may arise
between the parties to any suit brought under this act" (Acts
1899-1900, p. 797); that, acting under the provisions of this
statute, the Colonial Water Company has caused a survey and
plat to be made by the county surveyor of Gloucester county of
ten acres of the land of complainant, including the well—that is
to say, the land of which complainant is the owner and riparian
proprietor—and that the company has caused that survey and
plat to be returned to the clerk's office of Gloucester county, and
posted a notice at the front door of the court-house on the 4th
of May, 1900, to the effect that said survey and plat had been
filed in compliance with the provisions of the Act of Assembly
aforesaid, but that in fact the survey, plat and notice are erro-
neous, and do not comply with the requirements of said act;
that complainant is advised that the act aforesaid authorizes

the lease of ten acres of land, including the artesian well, only on the condition that it shall be determined by the court that the Commonwealth is the owner of the land, and that the private rights of no person shall be infringed upon; that it in plain terms declares it to be the purpose of the sovereign power of the State that the private rights of complainant shall not be interfered with or infringed upon, whether the Commonwealth be or be not the owner of said land; that even though the · Commonwealth be the owner it by no means follows from the act that a lease may be made to the Colonial Water Company, because it is expressly provided by its terms—First, That no natural oyster bed, rock or shoal shall be included in said ten acres of land; second, that the private rights of no person shall be infringed upon; and, third, that navigation in York river shall in no manner be obstructed or impeded; that it further declares that complainant's rights of every character, existing at the time of its passage, whether as owner of the land, riparian proprietor, or otherwise, shall be respected, and shall be paramount and superior to any rights which can by any possibility be acquired by the Colonial Water Company by virtue of said act; that the Commonwealth is not the owner of the land in controversy, but that, on the contrary, complainant is its sole owner, including said artesian well, and further that even though the Commonwealth were such owner, the private rights of complainant would be grossly interfered with and infringed upon by any lease made under said Act of March 5, 1900; that, without waiving any of her said rights, attention is called to · the fact that at the time of the passage of the Act of March 5, 1900, and for a long time previous thereto, complainant had and still has the statutory right to select any portion of the oyster planting ground fronting on "Rosewell," whether occupied by another person or not, and have same assigned to her exclusive use, provided only that said assignment does not exceed half an acre (see sec. 2137 of the Code, as amended by Acts of

1893-'4, p. 842); that complainant has never relinquished and now claims the right to have assigned to her under said statute one-half an acre of said ground, including the Colonial well, and further claims that the lease of ten acres of land, as provided by the Act of March 5, 1900, cannot be granted without infringing upon this and other rights of complainant, none of which she relinquishes, but all of which she claims and insists upon.

The prayer of the bill is that the well and the water therefrom be declared the property of complainant; that it be decreed that no lease can be made under the provisions of the Act of March 5, 1900, that the lease under which the Colonial Water Company claims to hold said well conveys no title to it whatsoever; and that said company may be compelled to surrender the possession thereof to complainant, and for general relief.

To this bill the Commonwealth of Virginia and the Colonial Water Company were made parties defendant, and filed their demurrer upon the following grounds:

First. The bill alleges that the plaintiff is the owner in fee simple of the soil of the bed of York river, between low water mark and the channel or navigable part of said stream, while the "demurrants insist that the right of plaintiff extends only to low watermark, and that she has no interest in the soil of the bed of said river, but that the soil of said bed is the property of the State of Virginia, so declared by statute, and the State, through the Legislature, has the authority to rent portions of the said bed to the demurrant, or any one else."

Second. That if plaintiff has any right whatever in the soil of said river between low watermark and the channel or navigable portion of said river, it is only the right to pass over the surface of the water in boats, vessels or river craft, or to erect wharves, piers or bulkheads opposite her said land; provided the navigation be not obstructed, nor the private rights of any person be otherwise injured thereby; and that should the plain-

tiff undertake to construct or build any such wharf, pier or bulkhead from her shore to a point of navigability, she would be required to so construct them as not to interfere with the said well of the demurrant."

Third. That "the bill alleges that the plat, notice and proceedings under the Act of March 5, 1900, are erroneous, and do not comply with the requirements of the act; that these acts were performed by the county surveyor, and are presumed to be correct, and the bill should point out wherein that officer failed in the discharge of his duties."

Fourth. That "plaintiff claims one-half acre of land for oyster planting purposes, but this right does not give her the ownership of the well, and she would be required to use said land for oyster purposes, so as not to interfere with the well and she would not thereby acquire ownership or control of the well, nor the fee simple to the soil of the bed of the river."

The Colonial Water Company also filed a cross bill, but it is not at present necessary to consider the questions which it presents.

When the case came on to be heard the judge of the Circuit Court filed a learned and able opinion, and entered a decree sustaining the demurrer and dismissing complainant's bill, but reserving for further consideration questions between the Colonial Water Company and the Commonwealth of Virginia, arising upon the cross bill. That decree is before us for review.

By section 1338 of the Code, it is declared, that "All the beds of the bays, rivers, creeks, and the shores of the sea within the jurisdiction of this Commonwealth, and not conveyed by special grant or compact according to law, shall continue and remain the property of the Commonwealth of Virginia, and may be used as a common by all the people of the State for the purpose of fishing and fowling, and of taking or catching oysters and other shell fish, subject to the provisions of chapters ninety-five, ninety-six and ninety-seven, and any future laws that may

be passed by the General Assembly; and no grant shall here-
after be issued by the Register of the Land Office to pass any
estate or interest of the Commonwealth in any natural oyster
bed, rock, or shoal, whether the said bed, rock, or shoal shall
ebb bare or not." And section 1339, subject to the provisions
of the section just quoted, extends "the limits or bounds of the
several tracts of land lying on the said bays, rivers, creeks, and
shores, and the rights and privileges of the owners of such lands
to low watermark, but no farther."

Is section 1338 a mere self-servient declaration of title, an
arbitrary assumption of right upon the part of the State, or is
it in accordance with the law of the land, as commonly received
and understood? The discussion of the subject invited us to
explore the past, and to investigate the power and authority, the
interest and the title of the English Crown in the soil under the
tidal waters of that realm; to discriminate between the power
of the Crown before the adoption of the *Magna Charta,* and as
limited by that instrument. The difficulty of the task and the
consciousness that at this day we could throw no light upon a
subject which has been so often considered by the ablest jurists,
disposes us to follow the example of Chief Justice Taney, who,
in the case of *Martin* v. *Waddell,* 16 Peters, 407, wisely said:
"We do not propose to meddle with the point as to the power of
the king since *Magna Charta* to grant to a subject a portion of
the soil covered by the navigable waters of the kingdom. . . .
For when the Revolution took place the people of each State
became themselves sovereign; and in that character hold the
absolute right to all their navigable waters and the soils under
them for their own common use, subject only to the rights since
surrendered by the Constitution to the general government. A
grant made by their authority must therefore manifestly be
tried and determined by different principles from those which
apply to grants of the British Crown, when the title is held by
a single individual in trust for the whole nation."

In *Smith* v. *Maryland,* 18 Howard, 71, 15 L. Ed. 269, Justice Curtis, delivering the opinion of the court, says: "Whatever soil below low watermark is the subject of exclusive propriety and ownership, belongs to the State on whose maritime border and within whose territory it lies, subject to any lawful grants of that soil by the State, or the sovereign power which governed its territory before the Declaration of Independence. But this soil is held by the State, not only subject to, but in some sense in trust for the enjoyment of certain public rights."

The case of *McCready* v. *Commonwealth of Virginia,* reported in 94 U. S. 391, 24 L. Ed. 248 (27 Gratt. 985), is one of peculiar interest in the consideration of this case. It originated in the county of Gloucester in this State, and involved the constitutionality of an Act of Assembly, which forbade the planting of oysters in the waters of the State by any person not a resident of the State. The case came to this court, which held, Judge Anderson delivering the opinion, that the navigable waters and the soil under them within the territorial limits of the State are the property of the State, to be controlled by it within its discretion for the benefit of its people, the only limitation upon that power being that it could not interfere with the authority of the government of the United States in regulating commerce and navigation. Upon a writ of error from the Supreme Court of the United States to the judgment of this court, Justice Waite, after reviewing numerous cases upon the subject, declares, that the principle has been long settled "that each State owns the beds of all tide-waters within its jurisdiction, unless they have been granted away. In like manner the States own the tide-waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty. The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce,

has been granted to the United States.  There has been, how-
ever, no such grant of power over the fisheries.  These remain
under the exclusive control of the State, which has consequently
the right, in its discretion, to appropriate its tide-waters, and
their beds, to be used by its people as a common for taking and
cultivating fish, so far as it may be done without obstructing
navigation.  Such an appropriation is, in effect, nothing more
than a regulation of the use by the people of their common
property.  The right which the people of the State thus ac-
quire comes not from their citizenship alone, but from their
citizenship and property combined.  It is, in fact, a property
right, and not a mere privilege or immunity of citizenship."

*Ill. Cent. Ry. Co.* v. *The People of the State of Illinois*, 146
U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018, contains an inter-
esting discussion of this whole subject.  The opinion of the
majority was delivered by Mr. Justice Field, and in it he states
it to be "the settled law of this country that the ownership of
and dominion and sovereignty over lands covered by tide-waters,
within the limits of the several States, belong to the respective
States within which they are found with the consequent right
to use or dispose of any portion thereof, when that can be done
without substantial impairment of the interest of the public in
the waters, and subject always to the paramount right of Con-
gress to control their navigation so far as may be necessary for
the regulation of commerce with foreign nations and among
the States.  This doctrine has been often announced by this
court, and is not questioned by counsel of any of the parties."
He then shows that the same doctrine is held applicable to lands
covered by fresh water in the Great Lakes, over which is con-
ducted an extended commerce with different States and foreign
nations, and which possess all the general characteristics of open
seas, except with respect to the freshness of their waters, and
the absence of the ebb and flow of the tide.  "In other respects
they are inland seas, and there is no reason or principle for

the assertion of dominion and sovereignty over and ownership by the State of lands covered by tide-waters that is not equally applicable to its ownership of and dominion and sovereignty over lands covered by the fresh waters of these lakes." As to the character of the title held by the State, he concludes that it is different from that which States hold in lands intended for sale. "It is a title held in trust for the people of the State, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction and intereference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and so long as their disposition is made for such purposes, no valid objections can be made to the grants. It is grants or parcels of lands under navigable waters, that may afford foundations for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and water remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the benefit of the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used

in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." He further declares in this opinion that the State can no more abdicate its trust over property in which the whole people are interested than it can abdicate its police powers in the administration of government and the preservation of the peace. "In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State."

This opinion was concurred in by three of the members of the court, while a dissenting opinion was delivered by Justice Shiras, concurred in by two of the justices, and the Chief Justice and Mr. Justice Blatchford did not sit.

The dissenting opinion maintains to the fullest extent the right of the State over the soil under tide-waters within its limits, with the consequent right to dispose of the title to any part of the soil in such manner as it may deem proper, subject only to the paramount right of navigation.

The position of the majority of the court is fairly summed up in the first syllabus of the report. "The ownership of and dominion and sovereignty over lands covered by tide-waters, and the fresh waters of the Great Lakes within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without impairment of the interest of the public in the waters, subject to the right of Congress to control their navigation for the regulation

of commerce." While, in the view of the minority, the right
of a State is absolute, and its control without limit.

In *Shively* v. *Bowlby,* 152 U. S. 1, 14 Sup. Ct. 548, 38 L.
Ed. 331, this subject was further discussed by Mr. Justice
Gray, who delivered the opinion, in which many authorities are
considered, and the conclusion reached that the lands under
tide-waters are vested in the States for the benefit of the whole
people, within their respective borders, subject to the rights
surrendered by the Constitution to the United States.    See
also *Alger* v. *Commonwealth,* 7 Cush. 53; *Florida* v. *Black
River Phosphate Co.,* 32 Fla. 82, 13 South. 640, 21 L. R. A.
189; *Gough* v. *Bell,* 21 N. J. L. 156; *Langdon* v. *New York,*
93 N. Y. 129; *Pollard* v. *Hagan,* 3 How. 212, 11 L. Ed. 565.

The authorities which we have cited abundantly establish the
proposition asserted by the court in *McCready* v. *Common-
wealth, supra,* that the navigable waters and the soil under them,
within the territorial limits of a State, are the property of the
State, to be controlled by the State, in its own discretion, for
the benefit of the people of the State, and demonstrate that sec-
tion 1338 of the Code is a declaration of right in the State,
sanctioned and supported by the common law.    See also *French*
v. *Bankhead,* 11 Gratt. 136.

Let us look at the case from another point of view.    The
claim of appellant rests upon her right as riparian owner, by
virtue of which she asserts title to the bed of the river between
low watermark and the line of navigability, and to its exclusive
use and enjoyment, subject only to the paramount right of the
United States and the right of fishery, which she concedes to the
Commonwealth as trustee for its citizens.    It is for the plain-
tiff to maintain her right.    The possession of the defendant is
sufficient, except as against the claim of one having a better
right to the possession.

At common law the title of the owner of land bounded by a
tidal stream extended to high watermark, and no farther.    By
an act of the Legislative Assembly of Virginia, passed in 1679

(2 Hen. Stat. 456), it was declared that "every man's right, by virtue of his patent, extends into the rivers or creeks so far as lower watermark," and our present statute upon the subject is found in section 1339 of the Code, which is set out in the beginning of this opinion. See *Garrison* v. *Hall,* 75 Va. 159; 1 Lomax's Dig. 661; 1 Rev. Code of 1819, ch. 87, p. 341. The effect of this legislation is to extend the limits or boundaries of land "by operation of law down to ordinary low watermark, and the right to the soil between ordinary high and low watermark annexed as incident or appurtenant to the adjacent land." *French* v. *Bankhead, supra; Groner* v. *Foster,* 94 Va. 650, 27 S. E. 493.

The fee simple title, therefore, of a riparian owner ends with low watermark. Between that point and the line of navigability the riparian owner has a qualified right, of which Justice Miller, in *Yates* v. *Milwaukee,* 10 Wall. U. S. R. 447, 19 L. Ed. 984, speaks as follows: "But whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing wharf or pier, for his own use, or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever those may be. This riparian right is property, and is valuable; and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary, that it be taken for the public good upon due compensation."

This court said, with respect to this subject, in *Norfolk City* v. *Cooke,* 27 Gratt. at page 435: "This right of the riparian owner is not a mere license or privilege, but is property, pro-

perty in the soil, up to the line of navigability, though covered by water; for the wharf, pier or bulkhead can only be built on the soil. It is not a mere easement to pass over the water, or a privilege to use the surface, but property in the soil under the water, on which to fasten and build such structures; and for this purpose and subject to the restriction that navigation shall not be obstructed, is as much property as the land above the margin of a navigable stream." This is a broad statement of the law, which we are not called upon in this case either to criticise or approve further than to remark that we think it well established that the right to build wharves is one which is subject to State regulation, and, while it involves a certain use of the soil under the water for the specific purposes designated, is not exclusive ownership.

Lewis on Eminent Domain, section 78, after stating the opinion of those writers and judges who maintain that the riparian owner has no private rights which are appurtenant to his land other than those of any other member of the public, and that the only difference is that he is more conveniently situated to enjoy the privileges which all the public have in common, and that he has access to the waters over his own land, which the public has not, says, "there are cases which hold that the riparian owners upon waters, the bed of which belongs to the public, have valuable rights appurtenant to their estates, of which they cannot be deprived without compensation. This seems to us the better and sounder rule. The opposite conclusion has been reached by a narrow and technical course of reasoning, based upon the fact that the title to the soil is in the State, or the public. It is assumed that this title gives the State the same absolute and exclusive control of the waters and their bed as an individual possesses over his private property. But there is really no analogy between the relations of a riparian owner to the waters upon which he abuts, and the relations between the proprietors of adjoining lands. The State holds the title to public waters as a trustee, merely, for the use of all the public

in common.   The very object in declaring the title in the public
is the better to secure this common use and benefit.   .    .    .
It is more reasonable, more logical and more just, to say that
these privileges are in fact rights, as inviolable as the soil itself.
The public loses nothing, for it is conceded that all these rights
are subject to the paramount right of the State to use and im-
prove the waters as shall best subserve the common rights of
all."

We have reached the conclusion that the title to the bed of
the river in question is held by the Commonwealth for the bene-
fit of all of its citizens, and that the riparian owner has certain
rights with respect to it.   These rights are enumerated in sec-
tion 83 of the 2nd Edition of Lewis on Eminent Domain, as
follows:

"First.  The right to be and remain a riparian proprietor and
to enjoy the natural advantages thereby conferred upon the
land by its adjacency to the water.

"Second.  The right of access to the water, including a right
of way to and from the navigable part.

"Third.  The right to build a pier or wharf out to navigable
water, subject to any regulations of the State.

"Fourth.  The right to accretions or alluvium.

"Fifth.  The right to make a reasonable use of the water as
it flows past or laves the land."

These rights of the riparian owner and the Commonwealth
must be exercised, if possible, so that the one shall not unneces-
sarily disturb or impair the enjoyment of the other.   Appellant
has built no wharf or pier, nor any like structure, upon her
premises, nor does it appear that she contemplates doing so.
When she does exercise that right, it must be in accordance with
such rules and regulations as the Commonwealth imposes for
the protection of the rights of the public.   Nor does it appear
that the right in the plaintiff of access to the water from her
land, or of a right of way to and from her shore to the navi-

gable part of the stream, has been interrupted or threatened, and the other enumerated rights are not called in question in this record.

When the riparian owner complains of an injury done to him in respect to these rights, the question to be considered is, does he present a case in which there has been any substantial interruption or impairment of his rights? Were he the owner in fee simple of the soil, any entry upon it without his consent would constitute a trespass, but having mere easements in the river, the riparian owner has no cause of complaint so long as he is permitted the full and undiminished enjoyment of these rights.

Two cases in the House of Lords illustrate this position. The Duke of Buccleuch was the occupier, under a lease from the Crown, of a house, the garden of which ran down to the Thames, where a wall protected it from the river, which flowed up to it at high water. There was a door in this wall, which was locked or opened at the pleasure of the plaintiff, and afforded him the means, at high water, of landing persons and goods, while at low water he was afforded the same privilege by a paved causeway, which ran from the door to the river. The river was embanked under authority of an Act of Parliament, and a large strip of dry land was formed where the river had formerly flowed up to the garden, and a public road was made between this strip of land and the river, and the plaintiff claimed compensation under the act. It was held that the loss of the use of the river frontage and the consequent loss of privacy, and the increase of dust and noise by the creation of the embankment and road, were subjects to be considered as occasioning deterioration in the value of the property. *Duke of Buccleuch* v. *Metropolitan Bd. of Wks.*, 5 Eng. & Irish App. 418.

In *North Shore Ry. Co.* v. *Pion,* 14 App. Cas. 612, an appeal from the Supreme Court of Canada, it appears that Pion had a large manufacturing establishment upon the foreshore of

the river St. Charles, a navigable stream, and upon which appellants constructed an embankment, whereby access to the river was cut off. The embankment extended along the whole length of respondent's river front, and cut off access to the river, except at two openings, one in front of and the other adjoining respondent's premises, through which the river was accessible at certain high tides.

In both these cases damages were awarded, it appearing that the right of access was in one case destroyed, and in the other case so far interrupted as to be rendered of little value.

In the case before us, the property of the plaintiff is used merely for farming purposes. There has not been erected, and, as far as the record discloses, there is no purpose to erect, any pier or wharf. She is engaged in no business requiring such access to the channel of the stream as cannot be fully enjoyed consistently with every right which the State has exercised, or which it has delegated to others. The Commonwealth holds as trustee a vast body of land covered by the flow of the tide precisely as in the case before us, for the benefit of her citizens. It is not only her right, but her duty, as such trustee, to render this property productive. Is it reasonable that the Commonwealth, holding title to the soil, is to be wholly subordinated in the use of it to the use with which another is clothed merely by virtue of being an owner of the adjoining shore, when the rights of each and all can be fully protected without diminution and without hindrance. If the time should come when the river front of the plaintiff shall be divided into lots whose owners find it necessary to their profitable enjoyment to erect piers and wharves upon them, if they engage in business which shall require exclusive access to the channel of the stream, it may be that a case could then be presented more meritorious than that which we have under consideration, and in the light of changed conditions the court may be again called upon to consider the respective rights of the riparian owner, and those remaining

in the Commonwealth, or which have been granted by her to others. The property in dispute was originally leased by the State as an oyster-planting ground. By chance, in the prosecution of that industry, mineral water was discovered far beneath the soil, which has proved of great value. There may be other and more valuable substances hidden in the soil; as to that, conjecture would be idle. But whatever that soil contains belongs to the State, and the State and it alone has the right to develop those hidden sources of wealth, if such there be, for the common benefit of all of its citizens.

With respect to plaintiff's claim to have the half-acre of land assigned to her under the statute, as an oyster-planting ground, it may be observed first that this is no part of her common law right, but is the creature of statute, of which she has not availed herself, and as to which she has no cause of action, if before availing herself of the right a subsequent statute defeats it. But if this be not so, she ought not to be permitted, capriciously and arbitrarily, to exercise that right and to locate the half-acre in a manner most injurious to others, and not more beneficial to herself, so far as the facts in this case disclose. She should be required to exercise that right in the manner least injurious to others, if that end can be accomplished without a wrong to her.

The views which we have expressed are not in conflict with any case heretofore decided by this court. Where the nature of the title of the Commonwealth has been considered, it has generally been in cases which involved the power of the State over the waters within it, with respect to the right of fishery, and language is used which implies absolute ownership and dominion. Of this class of cases, *McCready* v. *Commonwealth, supra,* is a fitting illustration. We shall not prolong this opinion by discussing each case in detail, but content ourselves with observing that the opinions are to be read and interpreted in the light of the facts under consideration. *Groner* v. *Foster, supra,*

and *Waverly, &c., Co.* v. *White,* 97 Va. 176, 33 S. E. 534, 45 L. R. A. 227, did not require a decision as to the nature of the Commonwealth's title. She was no party to those suits, which involved the rights of riparian owners, *inter se,* and the manner in which those rights should be apportioned, and the boundary lines between co-terminous owners determined and established. In this case, for the first time, this court has been called upon to deal with the conflicting rights of the riparian proprietor and the Commonwealth, and we have endeavored in the solution of the questions presented to apply that beneficent maxim of the civil law, *sic utere tuo ut alienum non laedas,* believing that, exercised in obedience to that benignant principle, every right of the parties to this controversy may be preserved and enjoyed.

In conclusion, we are of opinion that the plaintiff has no title as riparian owner to the water between low watermark and the channel of the river, nor to the soil beneath it; that as riparian proprietor she has certain rights beyond low water mark, as the right to build wharves and of access to the water and a right of way over it to the channel, and others perhaps which need not now be considered, including a right to locate a half-acre of land as an oyster-planting ground, but that all these rights may be enjoyed by her to their fullest extent without let or hindrance, diminution or impairment, by reason of any right or privilege granted to and exercised by the Colonial Water Company, under the facts as disclosed in this record. We are, therefore, of opinion that there was no error in dismissing the plaintiff's bill, and the decree of the Circuit Court is affirmed.

*Affirmed.*