Edward M. BOSTICK and Norma J. Bostick, his wife, and Henry I. Altshuler and Roselina R. Altshuler, his wife, and Anna B. Wickes and Virginia R. McDonnell, Appellants,

v.

SMOOT SAND & GRAVEL CORPORATION, Appellee.

No. 7578.

United States Court of Appeals Fourth Circuit.

Reargued April 24, 1958.

Decided Oct. 13, 1958.

James L. Morrisson, Washington, D. C. (David Ginsburg, Washington, D. C., and Ginsburg, Leventhal, Brown & Morrisson, Washington, D. C., on brief), for appellants.

Charles C. G. Evans, Baltimore, Md. (E. Clinton Bamberger, Jr., and Piper & Marbury, Baltimore, Md., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The plaintiffs, owners of lands in Virginia bordering on the Potomac River immediately downstream from Mount Vernon, seek, among other things in this action, damages for the removal, without their permission, of sand and gravel from the bed of the river between the channel and their lands on the Virginia shore. Since the bed of the stream is in Maryland, their claim is bottomed upon Article 27, Section 572 of the Annotated Code of Maryland, 1951, which reads as follows:

"572. It shall not be lawful for any person to dig, dredge, take and carry away any sand, gravel or other material from the bed of any of the navigable rivers, creeks or branches of this State, under a penalty of a fine not exceeding Three Hundred Dollars ($300), and confiscation of the boat, vessel, dredge and implements used in digging, dredging and carrying away such sand, gravel, or other material, and imprisonment in the county jail for a period not exceeding six months, in the discretion of the court; one-half of said fine and one-half of the proceeds of the sale of such confiscated boat, vessel, dredge and implements, to be paid by the sheriff to the informer, and the other half to the commissioners of public schools for the counties, provided, however, that it shall be lawful for any riparian owner of lands bordering on said rivers, creeks or branches, or for any person or corporation with whom such owner shall have a contract in writing for the purpose, or for the agents, servants or employees of such person or corporation to dig, dredge, take and carry away sand, gravel or other material from the bed of said river opposite said lands from highwater mark on the shore bordering on said lands to the outer line of the channel!

nearest said shore, subject to the laws of the United States relating to navigation; and provided further, that none of the provisions of this section shall be deemed to interfere in any manner with the provisions of any law of the State relating to the taking and catching of fish and oysters."

The District Judge concluded that the statutory phrase "any riparian owner of lands bordering on said river(s) * *," by which the recipients of the granted rights were described, should be construed as if it read "any owner of riparian lands in Maryland bordering on said river(s)," and that no right or interest in the bed of the river had been conferred upon the owners of riparian land in Virginia bordering on the Potomac. He held, in a learned opinion, that Smoot's dredging operations invaded no right of the plaintiffs which was entitled to judicial protection. Bostick v. Smoot Sand and Gravel Corporation, D.C.Md., 154 F. Supp. 744.

In the view we take of the case we need consider only the construction of the statutory language and do not reach a number of other interesting questions presented.

The dredging operations of which the plaintiffs complain are being conducted on the Virginia side of the channel, but the case is governed by the laws of Maryland and was tried in the District Court of that state because the state boundary was fixed by the Compact of 1785 at the low-water mark on the Virginia shore. Acts Md.1785, c. 1; Acts Va.1785, c. 17. Under the Black-Jenkins Award of 1877, Acts Va.1877–78, c. 246; Acts Md.1878, c. 374, it was settled that the low-water mark was to be measured from headland to headland, and the state boundary was more accurately fixed by the Mathews-Nelson Survey of 1928, Acts Va.1928, c. 477; Acts Md.1929, c. 50, but it is agreed that, opposite the plaintiffs' lands, the state boundary line coincides approximately with the low-water mark.[1] All of the dredging operations with which we are concerned, therefore, have been, or will be, conducted in Maryland.

The Potomac is a navigable river, the bed of which is owned by the State of Maryland. At common law, no owner of riparian lands in Maryland or in Virginia had any title to sand and gravel below low water or any exclusive right to remove it. Day v. Day, 22 Md. 530; Grinels v. Daniel, 110 Va. 874, 67 S.E. 534; Taylor v. Commonwealth of Virginia, 102 Va. 759, 47 S.E. 875. See also Potomac Dredging Co. of Baltimore City v. Smoot, 108 Md. 54, 69 A. 507; United States v. Smoot Sand and Gravel Corporation, 4 Cir., 248 F.2d 822. By statute, however, both Maryland and Virginia have undertaken to confer upon riparian owners the right to remove, and control the removal of, sand and gravel. Annotated Code of Maryland (1951 Ed.), Art. 27, Sec. 572; Virginia Code (1950 Ed.) §§ 62–1 to 3, 62–178 to 181. Whatever designation is attached to such a statutory right, it is conceded here that the riparian owner to whom the right is granted has an interest in the sand and gravel in the river bed sufficient to maintain an action against one who undertakes to remove it without his permission. Potomac Dredging Co. of Baltimore City v. Smoot, 108 Md. 54, 69 A. 507; Smoot Sand & Gravel Corporation v. Columbia Granite & Dredging Corporation, 146 Md. 384, 126 A. 91; United States v. Smoot Sand and Gravel Corporation, 4 Cir., 248 F.2d 822.

Prior to the invention of the mechanical dredge, sand and gravel had been taken from the Potomac's beaches in operations subject to the control of the owner of the adjacent fastland. When dredges began to operate in the river bed, without the permission of the riparian owners, the riparian owners were faced with the loss of a source of income, and some of them may have had aesthetic and other objections of the sort voiced by the

---

1. The opinion of the District Court contains an interesting account of the history of the location of the state boundary.

plaintiffs here. In apparent response to the complaints of owners of riparian land in Maryland bordering the Potomac, the Maryland General Assembly in 1888 adopted a criminal statute which forbade "any person to dig, dredge, take and carry away any sand, gravel or other material from the bed of the Potomac River * * *." Chapter 362 of the Laws of 1888 of the Maryland General Assembly. A violator of the statute was to be met with a fine, imprisonment and confiscation of the dredging equipment.

In 1900, Mr. Smoot, a resident of Virginia and the president of the defendant corporation, drafted and presented to the Maryland General Assembly a proposed bill to provide an exception to the absolute prohibition of the criminal statute. This proposal was adopted in Chapter 577 of the Laws of 1900 of the Maryland General Assembly, the exception to the criminal prohibition being in the following language:

"* * * provided, however, that it shall be lawful for any riparian owner of lands bordering on said Potomac River, or for any person or corporation with whom such owner shall have a contract in writing for the purpose, or for the agents, servants or employees of such person or corporation to dig, dredge, take and carry away sand, gravel or other material from the bed of said river opposite said lands from high water mark on the shore bordering on said lands to the outer line of the channel nearest said shore, subject to the laws of the United States relating to navigation. And provided, further, that none of the provisions of this section shall be deemed to interfere in any manner with the provisions of any law of the State of Maryland relating to the taking and catching of fish and oysters."

In 1906, there was a further amendment to extend the prohibition and the exception to all of the navigable waters of Maryland,[2] but it is not suggested that the 1906 amendment narrowed either the prohibition or the exception previously applicable to the removal of materials from the Potomac.

In 1956, Smoot applied to the United States Corps of Army Engineers for permission to dredge sand and gravel from the bed of the Potomac on the Virginia side of the channel opposite the lands of the plaintiffs, a permission requisite whether or not the dredging was to be done by one authorized under the Maryland statutes. The Corps of Engineers consulted the Maryland Board of Public Works which, after consideration, reported that it had no objection to the grant of this license by the Corps of Engineers. Smoot then began its present dredging operation without permission of the owners of the riparian lands in Virginia opposite which the dredging is being conducted or of the owners of any riparian lands in Maryland. Smoot, without payment of any sort to Maryland, to any riparian owner or to anyone else, set up its dredging operation off shore from the handsome residences of the plaintiffs claiming an unrestricted right to appropriate the sand and gravel on the Virginia side of the channel without regard to the claimed rights of anyone other than the United States and Maryland in the protection of navigation.

 The Act of 1888 prohibiting all removal of sand and gravel from the bed of the Potomac seems unequivocal and absolute. It is not suggested that the prohibition applies to less than all of the bed of the river within the jurisdiction of Maryland. It may be, as Smoot contends, that prior to 1930 the known commercial deposits of sand and gravel were on the Maryland side of the channel, but an absolute prohibition applicable to the entire bed of the river should not be construed to exempt all of the bed of the river south of the channel when the General Assembly took no action to indicate objectively any such limitation. A criminal statute may be enacted in re-

2. Chapter 426 of the Acts of the General Assembly of 1906.

sponse to specific complaints, but general language should not be restricted by the courts to the particularized application which motivated its adoption. Objectionable dredging at one place which gives rise to a general criminal statute proscribing all dredging in the bed of the river does not justify a plea of innocence that the questioned dredging in the bed of the river was not conducted in the area where the first complaint arose.

■ Under ordinary principles of construction, the exception, without specific limitation, should be as extensive as the prohibition. If a grant of special rights in the public domain is to be strictly construed so also is a criminal statute with an expressed exception, especially when it is urged that the criminal prohibition applies in a broader area than the statutory exception. If a riparian owner of lands in Virginia should have been indicted in Maryland in 1901 for digging sand opposite his land and on his side of the channel, Maryland would hardly have been heard to contend that the exception was inapplicable because the General Assembly which enacted it was uninformed that commercial sand and gravel deposits were present in that area.

It is suggested, however, that the statute itself discloses that it was intended to confer rights only upon the owners of riparian lands in Maryland for they may be exercised "from *high* water mark on the shore bordering on said lands to the outer line of the channel nearest said shore." Maryland's power extended only to the state line at the *low*-water mark on the Virginia side, and the statute cannot be given extraterritorial application to lands in Virgina. If control of the Maryland shore was not already vested in the riparian owners,[3] the extension of the right to the high-water mark does not necessarily suggest that the members of the General Assemblies of 1900 and 1906 had consciously in mind the complexities of the location of the state boundary or that if they intended to restrict the exception to the Maryland side of the chan-

nel they would have selected such an oblique path to their goal. More probably, the draftsman employed the high-water mark as the boundary of the exception to avoid any possible doubt that the exception was as broad in area as the prohibition against the removal of materials from the "bed" of the river. The statute can be limited in its application to lands within the borders of Maryland, but the use of language which, literally applied, would include the Virginia shore, beyond those borders, does not convince us that the exception should stop at a line well short of the line marking the limit of the power of the state and of its related criminal prohibition.

The original prohibition of 1888 applies to the "bed" of the river, portions of which are in Virginia, for, though the "bed" may be bounded by the low-water marks, the state line runs from headland to headland as was well-known in 1888 to those conversant with the boundary problem. A literal application of the prohibition to the entire bed of the river would include lands in Virginia, but if the criminal statute may not be given extraterritorial effect, the logical construction would make the prohibition applicable to so much of the bed of the river as lies in Maryland rather than to some lesser portion of it. The exception may, and should be, construed to apply in the same area.

■ The exception adopted in 1900 confers the privilege upon "any riparian owner of lands bordering on said Potomac River * * *," an inclusive phrase which is equally descriptive of the owners of lands in Virginia as of those of lands in Maryland. Had it been intended that the words should have a more restrictive meaning than that ordinarily attributable to them, simple, direct language expressing that intention could easily have been employed and the complicated language defining the area in which the privilege might be exercised could have been greatly simplified. We think the words should be given their usual

---

3. See Day v. Day, 22 Md. 530.

meaning and that we should not strain to find in them some hidden import.

Finally, it is suggested that the history of controversy between the states of Maryland and Virginia over the waters of the Potomac and free access to the sea makes it improbable that a Maryland legislature would have intended to confer valuable rights upon owners of riparian lands in Virginia. The Compact of 1785 ended Virginia's attempts to exact tolls from ships passing through the Virginia Capes to and from points in Maryland, fixed the boundary between the states, confirmed the riparian rights of the Virginia owners of lands bordering the Potomac and conferred a common right upon the citizens of both states to fish in the river, but provided that the citizens of the one state should not so exercise their rights as to disturb the fisheries on the shores of the other state. Incidents continued to occur, however, giving rise to irritation and controversy. By Joint Resolutions Nos. 6 and 11 of the Maryland Acts of 1894, it appears that the General Assembly of Maryland was exercised over an invasion of Maryland's waters by the Virginia Oyster Police Force and appointed a committee to confer with officials of Virginia to secure redress and to resolve conflicting claims. In 1896, other committees were appointed to confer about settlement of the 1894 incident and to consider concurrent legislation to be proposed for adoption by the two states to protect the rights of each.[4] In 1898 and 1900, other committees were appointed by the General Assembly of Maryland to discuss boundary adjustments and concurrent legislation for the conservation of fish.[5] Again in 1902, a committee was appointed to consider claimed irregularities in the administration by Virginia of the oyster laws and alleged trespasses by citizens of Virginia in Maryland waters.[6] Such difficulties and irritations have persisted into more recent times. In 1957, the General Assembly of Maryland undertook unilaterally to abrogate the Compact of 1785.[7]

■ If, however, in 1900, there were irritations growing out of the use and control of the fisheries on the river, it does not suggest that the members of the General Assembly of Maryland were so antipathetic to the interests of all owners of riparian lands in Virginia, bordering on the Potomac, as to undertake to circumscribe their riparian rights or to withhold from them new rights conferred upon riparian owners generally, or to create another discrimination of the sort which has given rise to irritation on the part of Maryland over the conduct it has attributed to Virginia and Virginians. If the owners of riparian land in Virginia, bordering on the Potomac, are not riparian owners within the meaning of the Maryland Act of 1900, they are the only riparian owners in the two states of Maryland and Virginia who do not have at least a qualified right to remove sand and gravel from the bed of the stream upon which the lands border. Such an intention should not be lightly attributed to the General Assembly of Maryland of 1900, and when no such intention is expressed in the language of the statute, we may not speculate what the members of that legislature might have done had they been reminded in 1900 that their action might confer some right or privilege upon Virginians.

■ As an alternative ground, it was suggested that the action of the Maryland Board of Public Works in advising the United States Corps of Engineers that Maryland had no objection to the issuance of a dredging permit to Smoot operated as a revocation of the plaintiffs'

4. Joint Resolutions, Nos. 1 and 13 of the Maryland Acts of 1896.

5. Joint Resolution, No. 1 of the Maryland Acts of 1898; Joint Resolution No. 9 of the Maryland Acts of 1900.

6. Joint Resolution, No. 6 of the Maryland Acts of 1902.

7. Chapter 766 of the Maryland Acts of 1957. The effectiveness of this action is being tested in an original proceeding pending in the Supreme Court of the United States filed by Virginia against Maryland.

statutory rights. The Board of Public Works had the authority to dispose of public property, including the beds of streams, for an adequate consideration,[8] but nothing appears which would authorize it to destroy or revoke private property rights which the legislature had created. Indeed, it is clear that the Board did not intend to revoke any private right, for it was advised by the Attorney General of Maryland that the plaintiffs had no rights under the statute.

We have given respectful consideration to the opinion of the Attorney General of Maryland, but it is not controlling here and we find ourselves unable to agree with his conclusion.

By a separate count in the complaint, the plaintiffs sought to enjoin Smoot's dredging operations as a nuisance. The nuisance issue is largely one of fact, which the District Judge resolved against the plaintiffs, after a careful analysis of the proof. We cannot hold his determination of the factual issues to have been clearly erroneous.

Under our construction of § 572, we do not reach the constitutional questions which the plaintiffs believe would follow a different construction. During the pendency of this action, however, Smoot actively and successfully urged upon the General Assembly the adoption of a statute which limits the granted rights to riparian owners of lands in Maryland.[9] At the instance of the plaintiffs, an amendment was adopted disclaiming any intention "to affect the outcome" of this litigation. This legislation may create, for future consideration, the constitutional issues we now avoid, and it may bear upon the scope of the relief to be awarded the plaintiffs. Such issues will be left open, and the case will be remanded to the District Court for further proceedings and the entry of such orders as may be appropriate in the light of this opinion, with leave to determine the effect, if any, of Chapter 498 of the Acts of 1957, or of any official action which may be taken thereunder, upon the terms and the extent of the relief to be granted.

Reversed and remanded.

---

8. In this instance, the Board collected no consideration from Smoot, and it appears that procedural prerequisites of an effective grant of state property may not have been followed.

9. Chapter 498 of the Acts of the Maryland General Assembly of 1957.