## CIRCUIT COURT OF LANCASTER COUNTY

Sanders Yacht Yard, Inc.

    v.

Crockett's Landing, Inc.

September 25, 2001

Case No. CH00-67

By Judge Harry T. Taliaferro, III

In this case, owners of adjacent waterfront parcels on Carters Creek seek apportionment of their riparian rights.

*Background*

The plaintiff acquired land from the Howard H. Barrack Estate (" the Barrack property" ) by Deed dated January 12, 2000, recorded in the Clerk's Office of this Court in Deed Book 427, at Page 779. A plat prepared by Charles R. Pruett, Certified Land Surveyor, dated November 28, 1997, recorded with such Deed shows the land fronting 233.75 feet on the low water line of Carters Creek. The Barrack property is improved by a residence and in the past had on it a crab house and pier used in a commercial seafood business.

The Barrack property is adjoined on its upstream side by the defendant's land (" the Crockett property" ). Defendant acquired this property from Southern Chesapeake Real Estate Corporation by Deed dated July 19, 1991, recorded in the Clerk's Office of this Court in Deed Book 319, at Page 213. The Crockett property was owned in the past by the father of Ronnie and Jimmy Lee Crockett. Mr. Crockett operated a commercial seafood business on the property. Buildings were constructed and a substantial pier was built in 1955 out into Carters Creek. The Crockett pier today has essentially the same configuration it had in 1955 except it is now wider, having been replanked and upgraded over the years, most recently by the addition of finger piers and pilings. This pier has been used commercially in the seafood business, for chartered fishing vessels and boat sales, and for boat slip rental. Large power vessels and sailboats berth at this pier.

Adjoining the plaintiff's property downstream is Irvington Marina. This business has existed at this location for over three decades. Irvington Marina accommodates large sailboats and power vessels. Just downstream of Irvington Marina is the plaintiff's boat yard which also accommodates large power vessels and sailboats.

Carters Creek's channel has sufficient depth to handle deep draft vessels. Its location on the lower Rappahannock River and proximity to the Chesapeake Bay and inland waterway make it a favored location for such vessels. It affords deeper water than many other creeks in the Northern Neck and Middle Peninsula.

The plaintiff has been in the boat yard business since 1972. Its President, Bruce Sanders, has a long familiarity with Carters Creek. His corporation acquired the Barrack property in order to expand its existing boat yard and marina facilities. It wishes to build piers where boats are to be moored and to construct a travel lift for hauling boats from the water for repair. Prior to purchasing the property in 2000, the plaintiff had a survey dated December 10, 1997, prepared by Charles R. Pruett which showed a riparian apportionment in Carters Creek for the Barrack and Crockett properties. This apportionment shows the line of navigability at minus 10 feet and a substantial encroachment by the Crockett pier on the Barrack riparian bottom. Before purchasing the property, the plaintiff asked the defendant to remove the pier encroachment. The defendant declined to do so. The plaintiff then bought the land and brought this suit.

### Riparian Apportionment

Courts of equity have exclusive jurisdiction to apportion riparian rights. *Zappulla v. Crown*, 239 Va. 566, 391 S.E.2d 65 (1990). Over a century ago,

in the case of *Groner v. Foster*, 94 Va. 650, 27 S.E. 493 (1897), the Virginia Supreme Court prescribed the manner in which riparian apportionment is to be made.[1] Under the *Groner* rule, each waterfront owner is entitled to riparian rights out to the line of navigability along a length of the same proportional to such owner's length of the shoreline.

There are five generally recognized riparian rights,[2] including the right to build a pier or wharf out to navigable water, subject to any regulations of the state. *Irby v. Roberts*, 256 Va. 324, 504 S.E.2d 841 (1998). It is a dispute over this right which has given rise to this litigation.

Each party had a survey prepared apportioning riparian rights. The plats of the plaintiff's surveyor, Charles R. Pruett, and the defendant's surveyor, Warren R. Keyser, are quite similar. Each shows the mean low water line and riparian boundaries as they run from the shore out into the creek. Mr. Keyser testified that the slight differences in the side boundary lines were within the acceptable variance which could be expected between different surveyors applying the *Groner* rule. Based on Mr. Keyser's testimony and the similarity of these plats, the Court finds that the survey of Charles R. Pruett dated December 10, 1997, admitted as plaintiff's exhibit 2 properly establishes the mean low water (MLW) line unaffected by cuts and fills and the side boundary lines of the riparian areas in question. There remains the question of establishing the line of navigability. On this matter, the two surveyors differed substantially.

### Line of Navigability

Each surveyor testified about how he established the line of navigability. Other witnesses testified about the piers in Carters Creek, various water depths, and the types and sizes of vessels using the Creek.

Mr. Pruett testified that he used his own observations to establish the line of navigability at minus 10 feet. He based his determination on his familiarity

---

[1] The *Groner* formula is stated as follows: "Measure the length of the shore and ascertain the portion thereof to which each riparian proprietor is entitled; next measure the length of the line of navigability and give to each proprietor the same proportion of it that he is entitled to of the shore line; and then draw straight lines from the points of division so marked for each proprietor on the line of navigability to the extremities of the lines on the shore."

[2] The five riparian rights are stated in *Taylor v. Commonwealth*, 102 Va. 759, 47 S.E. 875 (1904), as follows: "First, the right to be and remain a riparian proprietor and to enjoy the natural advantages thereby conferred upon the land by its adjacency to the water. Second, the right of access to the water including the right of way to and from the navigable part. Third, the right to build a pier or wharf out to navigable water, subject to the regulations of the state. Fourth, the right to accretions or alluvium. Fifth, the right to make reasonable use of the water as it flows past or laves the land." *Id.*, at 773.

with the creek, considering such matters as the channel depth, the depth of water at piers, and the kind and type of vessels normally using the creek. He also made reference to "quad sheets" which show water depths in and around the creek. Mr. Keyser testified that he used minus 4 feet as the line of navigability because this depth was used in almost every case and was the standard for the Northern Neck and Middle Peninsula. He identified minus 4 feet as the line of navigability in Broad Creek, Meechim Creek, and Porpoise Creek in Middlesex County and in the North River between Gloucester and Mathews Counties. He conceded on cross-examination that Broad, Meechim, and Porpoise Creeks were shallower than Carters Creek at their entrances. He agreed that the line of navigability could be less than four feet in shallower water and that he would "never say never" to a line of navigability deeper than minus 4 feet.

Mr. Wylie, the owner of Irvington Marina, testified that the channel off his property was 14 feet and that he had 10 feet of water at his fuel dock and 12 to 13 feet at his north pier. Approximately forty vessels were berthed at his marina, 10% of which are sailboats, the remaining being motor vessels. He also testified that many smaller vessels drawing only two to three feet use the water around his property. Captain Norman Mosher testified that he kept a sailboat drawing six feet of water at the Crockett pier. Bruce Sanders testified that, at his business just upstream from the Irvington Marina, he docked and hauled deep keel sailboats drawing as much as eight to nine feet and that he had nine to ten feet of water at the end of his pier. Approximately 75% of the vessels berthed at his facility are sailboats and 25% powerboats. Mr. Sanders also testified that the *Miss Ann*, the 130 foot yacht of the Tides Inn, travels the creek and that a 92 foot motor yacht, the *Bravo Zulu*, had been docked at the Crockett pier. He testified that sailboats frequenting the area commonly had drafts of six to eight feet, and that his yard had hauled boats having a draft of as much as nine feet. Mark Hollingsworth, who is employed as yard manager at Rappahannock Yachts and as a Captain of the *Miss Ann* and former Dock Master at the Tides Inn, testified that it is common for boats drawing seven to eight feet to dock at the Tides Inn, upstream of the plaintiff and defendant's properties. He testified the *Miss Ann* drew seven feet. He also testified that Carters Creek is deeper than most other creeks in the area. Ronnie and Jimmy Lee Crockett testified that over the years workboats of up to 45 to 50 feet in length had docked at Crockett's pier, that many of these boats drew two to three feet, and that smaller boats could dock within three to ten feet of shore. Carroll Davies, one of the owners of Crockett's Landing, testified that a forty-foot vessel at Crockett's pier was docked within ten feet of the shore with three feet of water under her bow. He also testified that a Cape Dorey, the 92 foot *Bravo Zulu*, and Captain Mosher's sailboat, all of which draw six feet, dock at Crockett's pier.

The plaintiff argues that the line of navigability should be defined as "the depth of water in which the vessels customarily using the waterway can safely navigate, taking into account the tidal range for the waterway." The defendant argues that the definition should be the line "where a person can simply get to the depth of water where he can use the water to travel on in a normal ordinary boat." There appears to be no clear Virginia authority on this point.

We are not without any guidance for establishing the line of navigability. The *Groner* case used the port warden's line as the line of navigability. The port warden's line was established by Harbor Commissioners pursuant to a state statute which directed that the line be fixed as the limit out to which the riparian owners may "erect wharves, docks, and other proper structures and fixtures for commercial and manufacturing purposes." The line was thus directly related to the existing use of the waterfront land and adjacent waters. *Black's Law Dictionary* (4th ed.) defines "navigable" as "capable of being navigated; that may be navigated or passed over in ships or vessels."

The United States Supreme Court in the case of *The David Ball*, 77 U.S. 557, 10 Wall. 563, 19 L. Ed. 999 (1871), rejected the English Common Law definition of navigability as waters subject to the ebb and flow of tides and defined such term for American legal usage as applying to water navigable in fact, that is waters which "are used, or are susceptible of being used, in their ordinary condition, as highways of commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on the water." In federal cases, "navigable" is frequently used as a term of art to determine whether the federal government has jurisdiction over waters under the Commerce Clause of the U.S. Constitution. The focus of these cases is upon whether the waters in question are highways of commerce based upon their past use, present use, or susceptibility to use in the future. (See *United States v. Appalachian Electric Power Co.*, 23 F. Supp. 83 (W.D. Va. 1938).) Such definitions are significantly distinguishable from the definition of a "line of navigability" as it pertains to riparian apportionment.

We conclude that the line of navigability for purposes of riparian apportionment is the line of contour at mean low water which provides a sufficient depth of water for riparian land owners to berth vessels of a type and size which ordinarily pass over adjacent navigable water taking into account the customary purposes for which such waters and riparian lands are used, subject to such regulations as may be imposed by the state.

The NOAA Chart for Carters Creek, Plaintiff's Exhibit No. 12, shows 15 to 17 feet of water at the channel entrance into Carters Creek from the Rappahannock River and 10 to 12 feet of water in the channel of the creek in the vicinity of the properties in question. Mr. Pruett's survey dated August 24, 1998, Plaintiff's Exhibit No. 4, shows the approximate location of a 240 foot

wide channel in Carter's Creek running well offshore of where the same survey shows mean low water contours from minus 2 feet to minus 10 feet. Defendant's Exhibit No. A, the pier permit obtained in 1993, shows a water depth at the end of Crockett's pier of minus 7.8 feet. Numerous vessels each drawing six feet have been regularly docked at this pier. The Plaintiff's Photographic Exhibits 5A through 5F show numerous large power and sail vessels either moored at the docks or hauled onto land for repair. The evidence in this case shows that Carter's Creek, unlike many other creeks, is commonly used by deep draft motor and sail vessels, that these vessels are serviced and dock at marinas and boat yards on the creek, and that such vessels commonly draw six to eight feet of water. By the application of the evidence to the rule adopted by this Court, the Court finds that the line of navigability in Carter's Creek for the properties in question is minus 8 feet MLW. The Court further finds that this line is shown on the Charles Pruett survey dated December 10, 1997, Plaintiff's Exhibit No. 8, as the "minus 8.0" line crossing the plaintiff and defendant's riparian areas. The Court also finds that, as shown on such plat, the Crockett pier substantially encroaches upon the riparian bottom apportioned to the plaintiff. The final question for this Court to determine is whether there exists a legal ground for the continuation of this encroachment.

### Prescription or Adverse Possession, Laches, and Statute of Limitations

The defendant alleges in its Cross-Bill that it has the right to use the part of its pier extending across the riparian bottom of the plaintiff by virtue of prescriptive use or adverse possession. It further argues that the plaintiff should be barred from seeking removal of such encroaching pier by application of the doctrine of laches and the statute of limitations based on the maxim that equity follows law.

The beds of bays, rivers, and creeks are owned by the Commonwealth. Virginia Code § 28.2-1200. This is not a case involving a claim of adverse possession against the state. Riparian rights are private property. They may be severed from land to which they were once appurtenant and dealt with separate and apart therefrom. *Thurston v. City of Portsmouth*, 205 Va. 909, 140 S.E.2d 678 (1965). Riparian rights may be lost by prescription or adverse use. 78 Am. Jur. 2d 722.

In order to establish prescriptive use of the plaintiff's riparian bottom, the defendant must show such use has been open, notorious, actual, continuous, exclusive, and hostile, accompanied by the claim of right for twenty years. *Walton v. Rosson*, 216 Va. 732, 222 S.E.2d 553 (1976). When use has been demonstrated in such a manner, the claim will be presumed and the use ripens

into a prescriptive easement. *Umbarger v. Phillips*, 240 Va. 120, 393 S.E.2d 198 (1990).

In the case before this Court, the open and visible use of the Crockett pier is established by the fact that it stands starkly out in the water offshore of the Barrack property. The evidence is that this pier had been actually and continuously used since its construction in 1955 for commercial purposes by the various owners of the Crockett property. This use was made exclusive to the right of any other person to use the bottom in question for a pier and in a manner which was hostile because it excluded all but the invitees of the owners of the Crockett property. It was shown to be under a claim of right by the fact that the straight line extensions of the Barrack property's side lines into the water (an erroneous although commonly made error in how riparian bottoms should be apportioned) puts the Barrack pier within the area between the extended sidelines. This evidence taken together with the other evidence in this case establishes the defendant's right by prescription over the plaintiff's riparian bottom to maintain and use the pier as presently situated. The Court further finds that such prescriptive right does not unduly restrict the plaintiff's exercise of the other four riparian rights enumerated in the *Taylor* case.

The case of *Whealton & Wisherd v. Doughty*, 112 Va. 649, 72 S.E. 112 (1911), and subsequent opinions in the same case cited by the plaintiff is distinguishable and unpersuasive. In *Whealton*, the land in question was a marsh. The facts there did not support adverse possession or prescriptive use because of the difficulty of proving use of a marsh.

The Court finds it unnecessary to consider the arguments related to laches and statute of limitations.

### Summary

The summary of this Court's ruling is as follows.

(1) The apportionment of the plaintiff's and defendant's riparian bottoms is as shown on the plat of Charles R. Pruett dated December 10, 1997, Plaintiff's Exhibit No. 8, with the exception that the line of navigability is the line shown on such plat as "minus 8.0" feet at MLW.

(2) The portion of defendant's pier shown on the aforesaid plat as located west of the riparian boundary having a course of N 48 [degrees] 56' 40" W and south of the mean low water contour line designated "-8.0" feet encroaches upon the riparian bottom of the plaintiff.

(3) By prescriptive use, the defendant has the right to continue to maintain and use the portion of its pier shown as encroaching on the plaintiff's riparian bottom as it is currently situated and used.